[812 NYS2d 66]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v MICHAEL GARCIA, Appellant.

First Department, March 28, 2006

256 

**APPEARANCES OF COUNSEL**

*Center for Appellate Litigation*, New York City (*Robert S. Dean* of counsel), for appellant.

*Robert M. Morgenthau, District Attorney*, New York City (*Alice Wiseman* and *Donald J. Siewert* of counsel), for respondent.

## OPINION OF THE COURT

CATTERSON, J.

The earliest known domestic animal appears to be the dog, a companion to mankind as early as 15000 B.C. Goats, sheep, pigs and cows followed in domestication in the next 10,000 years. Horses, however, did not succumb to the lure of mankind's presence until 4000 B.C. The domestication of fish is believed to have begun much later, in China during the Tang Dynasty, around 620 A.D. The common goldfish (Carassius auratus), a member of the carp family that was first domesticated in China, is now the most commonly kept aquarium fish. The goldfish's leap from domesticated fish to family pet and companion may have happened as early as 1368 during the Ming Dynasty. The goldfish's popularity in the West began as the first public aquarium opened in London in 1853. Keeping goldfish as companions and pets in the United States has been popular since that time.

Agriculture and Markets Law § 353-a (1), "Aggravated cruelty to animals," represents the Legislature's recognition that man's inhumanity to man often begins with inhumanity to those creatures that have formed particularly close relationships with mankind. (Assembly Mem in Support of L 1999, ch 118, 1999 McKinney's Session Laws of NY, at 1585.) The scope of section 353-a (1) is a question of first impression for the Appellate Division, and the instant case compels the conclusion that its reach is broad.

On August 2, 2003, Emelie Martinez was living in an apartment with the defendant, her three children, Juan Torres, Crystal and Emaleeann, and Jesus Rabassa, an 18-year-old high school student. Juan was nine years old, Crystal eight and Emaleeann five. Also living in the apartment were two dogs, a cat, and three goldfish named after the children, Junior, Crystal and Emma.

At about 3:00 A.M., Martinez awoke on the sofa to find the defendant standing over her, holding the fish tank. She asked him what he was doing. The defendant threw the fish tank into the television set, saying, "That could have been you." The fish tank shattered, as did the television screen and a portion of a glass wall unit. The defendant also destroyed Juan's VCR by ripping it out and throwing it against the wall unit.

Eventually, the defendant and Martinez began cleaning up the mess. Juan came out of his room, with the girls behind him, crying. The defendant turned to Juan and said, "You want to see something awesome?" and stomped on Juan's fish, killing the fish. Martinez had to calm the children before she could continue cleaning up the mess.

The next day, the defendant attacked Martinez inside her bedroom. He grabbed Martinez by the right hand, and flung her onto the bed. He began punching her head and face with closed fists. One blow forced her teeth against her inner cheek and caused bleeding inside her mouth. After punching her three or four times, the defendant allowed her to get up and she went into the bathroom, where she tried to stop the bleeding by rinsing her mouth with cold water.

The defendant followed her into the bathroom and told Martinez to go back to the bedroom, which she did. She sat down on the bed, and the defendant, after closing the door, climbed onto her, pinned her down with his knee on her chest, and began choking her with his right hand. She had trouble breathing and could not scream for help. While the defendant was choking Martinez with his right hand, he reached into his pants pocket with his left, and pulled out a gravity knife he always carried. Martinez managed to "wiggle" her way through, break loose and scream for her son. The defendant dropped the knife on the bed, unopened. The assault eventually escalated to the point where the defendant attacked Rabassa and nine-year-old Juan. The defendant was arrested later that same day.

He was indicted for attempted assault in the first degree, pursuant to Penal Law §§ 110.00 and 120.10 (intent to cause serious physical injury by means of a deadly weapon or a dangerous instrument). At his nonjury trial, in his motion for a trial order of dismissal, the defendant argued that the evidence was insufficient to prove either an intent to cause serious physical injury or an attempt to do so with a dangerous instrument. He argued that the evidence of weapon possession in the third degree pursuant to Penal Law § 265.02 (1) (commission of fourth-degree weapon possession after having previously been convicted of a crime) was also insufficient because he did not intend to use the knife against Martinez. The defendant pointed out that he could have used the knife against her if that had been his intent, but he did not use it.

The prosecutor argued that the defendant took the knife out of his pocket "because the assault was escalating" and that

when he did so his intent was to commit serious physical injury. He further argued that because the defendant intended to use the knife unlawfully, the evidence was sufficient to sustain the weapon possession count.

At the close of arguments and summations, the court observed that it had the power, sua sponte, to consider the lesser included offense of attempted second-degree assault pursuant to Penal Law §§ 110.00 and 120.05 (1) (with intent to cause serious physical injury, attempting to cause such injury, no weapon). Defense counsel objected that the parties had summed up on the theory of the defendant's attempt to cause serious physical injury with the use of the knife, not of his hand. The court then dismissed the attempted first-degree assault count and found the defendant guilty of attempted second-degree assault.

On the date of sentence and at the defendant's request, the court stated that it found the attempted second-degree charge proved beyond a reasonable doubt based on all the defendant's conduct inside the apartment. This conduct included the pulling of the knife out of his pants pocket as well as his beating of Martinez with his fists before he pulled the knife. The court later said that it did not think the knife was intended to cause serious physical injury but rather to menace Martinez, and that it convicted the defendant on the theory of attempted assault in the second degree with intent to cause serious physical injury, without a weapon.

The trial court also convicted the defendant of aggravated cruelty to animals, a felony. The court determined that the pet goldfish of Martinez and her children was a companion animal within the meaning of Agriculture and Markets Law § 353-a (1) and § 350 (5), and that the statute is not unconstitutionally vague.

### "ALL CREATURES GREAT AND SMALL"*

■ The defendant argues that his "stomping of young Juan's pet goldfish" is a misdemeanor pursuant to Agriculture and Markets Law § 353 (unjustifiable killing of any animal, whether wild or tame), and not a felony because a fish is not a "companion animal" and his "stomping" did not constitute "aggravated cruelty" within the meaning of the statute.

Agriculture and Markets Law § 353-a (1) provides:

---

* "All things bright and beautiful, all creatures great and small, all things wise and wonderful: The Lord God made them all." (Cecil F. Alexander, Hymns For Little Children [1848].)

"A person is guilty of aggravated cruelty to animals when, with no justifiable purpose, he or she intentionally kills or intentionally causes serious physical injury to a companion animal with aggravated cruelty. For purposes of this section, 'aggravated cruelty' shall mean conduct which: (i) is intended to cause extreme physical pain; or (ii) is done or carried out in an especially depraved or sadistic manner."

The term "companion animal" is defined in section 350 (5):

" 'Companion animal' or 'pet' means any dog or cat, and shall also mean any other domesticated animal normally maintained in or near the household of the owner or person who cares for such other domesticated animal. 'Pet' or 'companion animal' shall not include a 'farm animal' as defined in this section."

The defendant contends that a fish is not a companion animal because it is not domesticated and because there is no reciprocity or mutuality of feeling between a fish and its owner, such as there is between a dog or a cat and its owner.

In the absence of a definition in the statute, the defendant, citing 4 Am Jur 2d, Animals § 2 (at 346 [Lawyers Coop Publ 1995]), defines "domesticated animals" as those that "no longer possess the disposition or inclination to escape," and claims that "if dropped in a pond and offered the opportunity to swim away, a goldfish will do so without any hesitation and not look back." He maintains that the statute's reference to "any other" domesticated animal limits "companion animal[s]" to those that are similar to dogs or cats, that is, those with a degree of sentience sufficiently elevated to enable them to enter into a relationship of mutual affection with a human being. Furthermore, "[b]eloved household pets (fish) may be, but 'companion animals' in the same vein as dogs or cats they are not."

The defendant's contention that all household pets are equal but some are more equal than others is manifestly not derived from the statute. The Legislature simply did not require a reciprocity of affection in the definition of "companion animal." To the contrary, the statutory language is consistent with the People's contention that, "domesticated" is commonly understood to mean "to adapt (an animal or plant) to life in intimate association with and to the advantage of humans." Thus, a goldfish such as the one herein is a domesticated rather than a

wild animal within the common meaning of the term. Moreover, the goldfish was, as the statute requires, "normally maintained in or near the household of the owner or person who cares for [it]." Indeed, acknowledging that the goldfish is one of the most common household pets, defense counsel stipulated at trial that there are "millions of fish owners throughout the country."

The defendant's argument that goldfish are not domesticated animals because given the opportunity they would leave home is without merit. While this trait arguably distinguishes fish from dogs and, probably to a lesser extent cats, it fails to take into account that many other animals commonly considered pets, such as hermit crabs, gerbils, hamsters, guinea pigs and rabbits, would depart for less confining venues and greener pastures if given the opportunity. Loyalty, if that is what it is, is merely another characteristic urged by defendant—but not included by the Legislature—as a defining feature of a companion animal.

Moreover, Agriculture and Markets Law § 353-a (2) provides that "[n]othing contained in this section shall be construed to prohibit or interfere in any way with anyone lawfully engaged in hunting, trapping, or *fishing* . . . ." (Emphasis added.) This provision would be superfluous if a fish could not be considered a companion animal.

While the defendant maintains that the statute's definition of "companion animal" is unconstitutionally vague, we find, as did the trial court, the statute sufficiently clear to apprise a person of ordinary intelligence that the sort of conduct in which the defendant engaged comes within the statute's prohibition. (*See United States v Harriss*, 347 US 612, 617 [1954].)

The defendant further asserts that because the fish's death was instantaneous, it was not accompanied by "extreme physical pain" or accomplished with "especial[ ]" depravity or sadism, and that therefore the killing was not accomplished with any heightened level of cruelty. The trial court correctly observed that the legislative history of the statute indicates that the crime was established in recognition of the correlation between violence against animals and subsequent violence against human beings. (*People v Garcia*, 3 Misc 3d 699, 702 [Sup Ct, NY County 2004].) Thus, it must be inferred that the Legislature's concern was with the state of mind of the perpetrator rather than that of the victim.

## THE REMAINING CRIMINAL CHARGES

■ The court improperly exercised its discretion in considering attempted assault in the second degree as a lesser included

offense of first-degree attempted assault. Although CPL 300.50 (1) gives the trial court discretion to consider a lesser included offense without a request by a party, that discretion is limited. (*People v Rothman*, 117 AD2d 535, 536 [1st Dept 1986], *affd* 69 NY2d 767 [1987] ["(w)hen the People have limited the theory of the prosecution, the court is obliged to observe that limitation"].) The prosecution tried its case, inter alia, on the theory that the defendant's use of the knife in the struggle against Martinez established the necessary element of attempt to cause serious physical injury. Counsel for the defendant vigorously cross-examined Martinez on that point and summed up on it as well. It was not until after summations that the trial court indicated that it would consider attempted second-degree assault based upon a milk carton throwing incident that preceded the altercation in Martinez's apartment and then ultimately based upon the defendant's use of his hand to injure Martinez during the altercation. This represented a significant departure from the prosecution's theory of the case against the defendant and requires reversal consistent with *Rothman* (*supra*; *see also People v Glover*, 57 NY2d 61 [1982]; *compare People v Luke*, 8 AD3d 203 [2004], *lv denied* 3 NY3d 740 [2004].)

■ The indictment charged the defendant with criminal mischief in the second degree pursuant to Penal Law § 145.10 (damaging property of another in an amount exceeding $1,500). In his motion for a trial order of dismissal, the defendant argued that since the prosecution failed to prove any particular amount, only the lesser included misdemeanor fourth-degree criminal mischief, intentionally damaging property of another, no value attached, was established pursuant to Penal Law § 145.00. The prosecutor conceded that proof of repair cost must come from either an expert witness or a documented source, and thus a hearsay problem existed as to repair cost.

The court then indicated that it was inclined to consider as lesser included offenses fourth-degree and third-degree criminal mischief pursuant to Penal Law § 145.05 (2) (intentionally damaging another's property in an amount exceeding $250). Defense counsel argued that without documentation only the misdemeanor could be proven, and the prosecutor conceded that "if repair value carries the day," only fourth-degree criminal mischief had been proven.

The court found, however, that photographic evidence of the damage to the wall unit and, particularly, to the television screen in addition to Martinez's testimony as to what she paid for

those items, together with her claim that the repair cost would be $500 for the wall unit and $700 for the television were sufficient to establish repair cost in excess of $250. We agree.

In a criminal mischief case, the amount of damage is generally measured by the reasonable cost of repairing the damaged property, provided it can be repaired. (*See People v Katovich*, 238 AD2d 751 [3d Dept 1997]; *see also People v Daniels*, 180 AD2d 567 [1st Dept 1992], *lv denied* 80 NY2d 829 [1992].) The repair cost may be established by expert testimony. (*People v Smeraldo*, 242 AD2d 886 [4th Dept 1997], *lv denied* 91 NY2d 880 [1997] [testimony of collision shop owner as to cost to repair car]; *People v Woodard*, 148 AD2d 997 [4th Dept 1989], *lv denied* 74 NY2d 749 [1989] [testimony of general foreman of board of education as to cost to repair broken school window].) It may be established by documentation. (*People v Wilson*, 284 AD2d 420, 421 [2d Dept 2001], *lv denied* 96 NY2d 926 [2001] [complainant's testimony that the repair and the replacement of the damaged property cost over $1,500 was insufficient, since that testimony was unsupported by documentation or other evidence of the reasonable cost of repair and replacement]; *People v Gaines*, 136 AD2d 731, 734 [2d Dept1988], *lv denied* 71 NY2d 896 [1988] [restaurant owner's testimony as to cost of repair was insufficient because not supported by "any documentation or other proof that said amount represented the reasonable cost of such repairs"].) It may not be established by hearsay. (*People v Jeffries*, 151 AD2d 964 [4th Dept 1989], *lv denied* 74 NY2d 848 [1989]; *People v Butler*, 123 AD2d 877 [2d Dept 1986].)

In the case at bar, there was no expert testimony or documentation as to repair costs. The only documentary evidence was Martinez's receipt showing that the television had cost $1,700 when new, 13 months earlier. Her testimony about repair estimates was hearsay. As to the photographs, the court cited, and on appeal the People cite *People v Hoppe* (184 AD2d 582 [2d Dept 1992]) in support of using them to determine, or aid in determining, the amount of damage. The *Hoppe* court found that the complainant's testimony that the repairs cost $4,500 was insufficient because it was unsupported by documentation or other evidence that that amount represented the reasonable cost of the repairs. However, upon review of the photographs of the damage introduced at trial, the court found that they demonstrated beyond a reasonable doubt that the amount of the damage exceeded $250.

The defendant argues that the photographs here do not illuminate the record beyond the witnesses' trial testimony, but

show (1) cracked glass, (2) Juan holding a new goldfish bowl in front of a white sheet, and (3) broken television-screen glass on a floor. Indeed, the People concede that "nothing in the photographs, standing alone, could establish an exact repair value." However, the People contend that the photographs "did confirm the magnitude of the repairs required, and did establish that the costs would be far from trivial." The People also observe that the estimates about which Martinez gave hearsay testimony meet the statutory threshold even if they are discounted by almost 80%, and that "[m]oreover, common sense dictates that repairs of the magnitude required in this case cannot be made in New York City for under $250." We find the People's argument persuasive and accordingly conclude that there was ample evidentiary support for the trial court's conclusion that repair costs of at least $250 were proved.

■ Finally, the People concede that the defendant's adjudication as a second violent felony offender must be vacated because he was not convicted of any violent felony in this case. However, since the sentences imposed were all lawful for a nonviolent second felony offender and the trial court stated its intention to sentence defendant to the maximum possible term, there is no need for resentencing. (*People v Robles*, 251 AD2d 20 [1998], *lv denied* 92 NY2d 904 [1998].) We perceive no basis for reducing the sentence, except as indicated.

Accordingly, the judgment of the Supreme Court, New York County (Marcy L. Kahn, J.), rendered February 23, 2004, convicting defendant, after a nonjury trial, of attempted assault in the second degree, criminal possession of a weapon in the third degree, criminal mischief in the third degree, assault in the third degree (three counts), endangering the welfare of a child (three counts), and aggravated cruelty to animals in violation of Agriculture and Markets Law § 353-a (1), and sentencing him, as a second violent felony offender, to an aggregate term of 7½ to 15 years, should be modified, on the law, to the extent of vacating the conviction for attempted assault in the second degree, and replacing the second violent felony offender adjudication with a second felony offender adjudication, reducing the aggregate sentence to 5½ to 11 years, and otherwise affirmed.

BUCKLEY, P.J., SULLIVAN, WILLIAMS and GONZALEZ, JJ., concur.

Judgment, Supreme Court, New York County, rendered February 23, 2004, modified, on the law, to the extent of vacating the conviction for attempted assault in the second degree, and

replacing the second violent felony offender adjudication with a second felony offender adjudication, reducing the sentence, and otherwise affirmed.