OPINION OF THE COURT
 

 Levine, J.
 

 Aliza K. is an involuntarily committed civil patient hospital
 
 *504
 
 ized at Manhattan Psychiatric Center (MPC), a civil mental health facility of the State Office of Mental Health (OMH). She was charged with aggravated harassment after having already served two sentences for stalking, threatening and harassing her former employer (with whom she apparently at one time had a romantic involvement) and the staff of his business. The new charges were dismissed after she was found unfit to proceed to trial. Aliza K. was then transferred from the criminal detention facility at Rikers Island pursuant to CPL 730.40. On March 14, 1994, she was admitted into MPC pursuant to Mental Hygiene Law § 9.33. She was diagnosed as suffering from an erotomanic delusional disorder, which caused her to believe that her former employer still loved her and to compulsively seek contact with him. The employer had to obtain an order of protection against her, and despite the order, at MPC Aliza K. repeatedly stated that she would never stop pursuing him. Following some physical altercations with hospital staff, she was transferred to the Intensive Psychiatric Service unit of MPC, a locked ward which is reserved for the most violent patients.
 

 On May 3, 1995, MPC requested that Aliza K. be transferred to Kirby Forensic Psychiatric Center (Kirby), one of the two secure OMH facilities in the State
 
 (see,
 
 14 NYCRR 57.1). Aliza K.’s treating psychiatrist prepared a clinical summary giving the medical reasons for the transfer application. According to that summary, Aliza K. had made 10-20 calls to her former employer’s business or home each day, and she assaulted staff when they tried to prevent her from using the telephone to call him. She also threatened people at her employer’s place of business who tried to shield him from her calls. She wrote to him daily, writing his surname as her last name on the return address, as if she were married to him. She repeatedly tried to kick down the nursing station door to gain access to the telephone inside. Her behavior required her to be kept in seclusion and to be given emergency medication to modify her aggressive physical behavior. On a daily basis, she had to be physically restrained by staff in attempts to prevent injury to others. The one time she was outside the Intensive Psychiatric Service unit in the last 14 months, she threw a large rock at an employee’s head and tried to escape. She stated that she would hurt anyone who got in the way of her reuniting with her former employer.
 

 On May 5, 1995, the OMH Commissioner authorized the transfer to Kirby and, as required by 14 NYCRR 57.2, notified
 
 *505
 
 Mental Hygiene Legal Services (MHLS) of the transfer. When petitioner objected to the transfer, the Commissioner appointed another psychiatrist who was independent from the hospital to evaluate her. After the independent psychiatrist examined Aliza K. and interviewed the treating psychiatrist at MFC who had prepared the clinical summary, she confirmed that the determination to issue a transfer order was medically justified.
 

 On May 10, 1995, Aliza K. commenced this proceeding by serving MFC with a writ of habeas corpus to block the transfer or to obtain her release, claiming that she had a right to a judicial hearing prior to a nonemergency transfer to a secure OMH facility. Supreme Court converted the proceeding into a declaratory judgment action and consolidated that action with the writ. The court, after enjoining the transfer, granted her motion for summary judgment on both due process and equal protection grounds, and declared that a hearing provision must be read into 14 NYCRR 57.2 so that no transfer of any person could take place prior to a judicial hearing. The Appellate Division rejected petitioner’s equal protection argument but agreed on due process grounds that a judicial hearing was required prior to a transfer (242 AD2d 417). The Appellate Division concluded that since the primary motivation for the transfer was not
 
 a
 
 general medical diagnosis but rather security concerns, a judicial hearing was required prior to a nonemergency transfer to a secure OMH facility. The case was appealed as of right upon stipulation for judgment absolute (CPLR 5601 [c]), and we now reverse.
 

 Initially, we reject Aliza K.’s contention that the case should be dismissed because it has become moot. On October 8, 1998, Aliza K. was still residing at MFC, having never been transferred to Kirby because of the decisions of the courts below. After a retainer hearing on whether she should remain in custody at all
 
 (see,
 
 Mental Hygiene Law § 9.33), Supreme Court ordered her release from OMH. OMH appealed the order, and on October 13, 1998, the parties stipulated to a two-week stay of the release order to permit OMH to prepare a discharge plan.
 

 Even if Aliza K.’s present status renders this appeal moot as to her, the exception to the mootness doctrine for issues that are likely to recur applies. The Mental Hygiene Law contemplates that involuntary hospitalization in a mental health facility is often brief and temporary. That statute and its implementing regulations require frequent periodic review of a patient’s status, and the release of the patient unless OMH is
 
 *506
 
 granted, successive court orders authorizing retention
 
 (see,
 
 Mental Hygiene Law § 9.33; 14 NYCRR 57.4 [b]). It follows that this is the kind of case that falls within the exception in that it is likely to recur, will typically evade review, and is substantial and novel
 
 (see, Matter of Chenier v Richard
 
 W., 82 NY2d 830, 832). Therefore, we turn to the merits of the case.
 

 The administrative rules governing the nonemergency transfers of involuntarily committed patients to secure facilities are set forth in 14 NYCRR part 57. Under those regulations, the director of the transferring hospital is required to submit a written request to the Commissioner of OMH demonstrating that (1) there is a substantial risk that the patient may cause physical harm to other persons, (2) reasonable efforts at treatment have been made without eliminating that risk, and (3) the patient needs the close supervision provided at a secure facility (14 NYCRR 57.2 [a]). A copy of the director’s request, together with a copy of 14 NYCRR part 57, must be provided to the patient, MHLS and the patient’s nearest relative if known (§ 57.2 [a] [3]). If the Commissioner finds that the application sets forth facts justifying the transfer, the director again must notify the patient, MHLS and the patient’s closest relative.
 

 The patient or anyone on the patient’s behalf has the opportunity to object to the transfer with “appropriate written arguments supported by documents, statements, and affidavits” (§ 57.2 [c]). Upon objection to the transfer by the patient or the patient’s representative, the transfer is stayed until the Commissioner designates a qualified and independent psychiatrist to interview the patient and other knowledgeable parties, and to prepare a report and recommendation regarding the transfer (§ 57.2 [d]). The report is provided to the Commissioner, the patient and the patient’s representatives, and they are afforded the opportunity to comment upon it and to submit additional evidence in opposition to the transfer
 
 (id.).
 
 Before the transfer takes place, the Commissioner must notify all the interested parties of the decision, and the transfer is stayed for at least 24 hours to enable the patient to take any legal action deemed appropriate
 
 (id.).
 
 The patient may initiate a CPLR article 78 proceeding to challenge the transfer (§ 57.6).
 

 Unlike MPC, all the patients at Kirby are continuously subject to heightened security irrespective of their conduct. Also, because a high percentage of the patients at Kirby are transferred from the criminal justice system as incompetent to stand trial
 
 (see,
 
 CPL art 730) or are committed as a result of
 
 *507
 
 having been found not criminally responsible by reason of mental disease or defect
 
 (see,
 
 CPL 330.20), the stigma of being a patient at Kirby may be greater than that of being hospitalized at MPC. Thus, Aliza K.’s transfer implicates a liberty interest which triggers rights to procedural due process
 
 (see, Matter of Kesselbrenner v Anonymous,
 
 33 NY2d 161, 167;
 
 Vitek v Jones,
 
 445 US 480, 494). We conclude, however, that the requirements of due process were satisfied under the circumstances of this case.
 

 In determining what process is constitutionally due Aliza K. regarding her transfer to a secure mental health facility, we weigh the three factors identified in
 
 Mathews v Eldridge
 
 (424 US 319):
 

 “[flirst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government’s interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail”
 
 (id.,
 
 at 334-335).
 

 First, we consider the liberty interest at stake. On the record before us, this is not a situation, like
 
 Matter of Kesselbrenner v Anonymous (supra,
 
 33 NY2d, at 166), where the patient is being transferred to a “penal, security-oriented facility” operated by the Department of Correction. Critical to the
 
 Kesselbrenner
 
 decision that the transfer violated the petitioner’s due process rights was that Department of Mental Hygiene facilities afforded significantly greater freedom to civilly committed patients than the Department of Correction facility
 
 (id.).
 
 Indeed, we noted that the facility in question had been characterized as “ ‘no different from a jail’ ”
 
 (id.,
 
 at 167).
 

 Here, Aliza K. is being transferred to an OMH facility, not a correctional facility. Prior to the transfer request, Aliza K. was already confined to the Intensive Psychiatric Service unit of MPC and her behavior required periods of enforced seclusion. Indeed, the transfer regulations contain an express finding that by reason of its trained staff and perimeter security, the Kirby facility “permit [s]
 
 freer
 
 movement” of patients such as Aliza K. who require close supervision (14 NYCRR 57.1 [emphasis supplied]). There was no record evidence to refute the accuracy of that finding in this case. Thus, petitioner
 
 *508
 
 has not established that her liberty interest was as severely affected as that considered in
 
 Kesselbrenner.
 

 The second
 
 Mathews v Eldridge
 
 inquiry required here is the risk of an erroneous deprivation of Aliza K.’s liberty interest under the current transfer procedures of the statute and regulations, and the likely value of the additional procedural safeguard urged here of a pretransfer judicial hearing.
 

 In
 
 Savastano v Nurnberg,
 
 the Court reviewed the regulatory criteria for a transfer under 14 NYCRR 517.4 (d) (1), and concluded that “the decision to transfer reflects primarily a
 
 medical
 
 judgment about the kind of facility that would best serve the patient’s therapeutic needs”
 
 (Savastano v Nurnberg,
 
 77 NY2d 300, 308 [emphasis in original]). Here, as well, under the regulatory scheme, the transfer decision is primarily one of professional medical judgment as to the most appropriate therapeutic setting (14 NYCRR 57.1). Whether security concerns also play a role in the transfer decision is irrelevant since “such concerns are relevant to decisions regarding treatment” (Sa
 
 vastano v Nurnberg,
 
 at 309). Kirby and its sister secure psychiatric center
 

 “have the staff and physical surroundings to enable them to offer such programs and services to patients requiring closer supervision than can be given at other hospitals. Patients whose behavior is such as to raise the likelihood of their causing harm to others cannot be given the care and treatment they require at such other hospitals since, for the protection of other patiénts and staff of such hospitals, they must be kept in closed wards and even in seclusion” (14 NYCRR 57.1).
 

 As already noted, a patient for whom an application has been made has the rights of notice and complete disclosure of the documents submitted with the application, is afforded legal representation at all stages of the administrative process, and is entitled to a full review of the transfer by a qualified independent psychiatrist. At each stage, the patient and the patient’s representative are entitled to submit opposing arguments and any pertinent countervailing evidence. The record does not substantiate the existence of any serious risk that these procedures give rise to erroneous transfer determinations.
 

 Likewise, there has been no showing that the additional safeguard of a judicial hearing would significantly reduce the
 
 *509
 
 possibility of an erroneous transfer decision. Here, as in
 
 Savastano,
 
 we conclude that shifting from mental health professionals to Judges the determination of which therapeutic environment is most appropriate would not significantly add assurance against the risk of an erroneous decision
 
 (Savastano v Nurnberg, supra,
 
 at 309). As the Supreme Court has noted, “Common human experience and scholarly opinions suggest that the supposed protections of an adversary proceeding to determine the appropriateness of medical decisions for the commitment and treatment of mental and emotional illness may well be more illusory than real”
 
 (Parham v J. R.,
 
 442 US 584, 609).
 

 We disagree with the conclusion of the Appellate Division that a judicial hearing was required because the “transfer [was] based on security concerns, narrowly connected to the patient’s delusion” (242 AD2d, at 418,
 
 supra).
 
 The statement could be interpreted as a conclusion that no considerations of the treatment of the patient’s condition were involved in this transfer decision. Such a conclusion would be entirely unsupported by the record. As already noted, the report of the treating psychiatrist in support of the transfer application recites in detail that her medical condition was deteriorating, and that her behavior necessitated prolonged periods of seclusion and use of emergency medication. The director of MFC opined that the management of her treatment could be more appropriately discharged in a secure facility. Their professional assessments of Aliza K.’s condition and treatment needs were confirmed by an independent psychiatrist.
 

 On the other hand, the Appellate Division decision may be premised on a conclusion that “the
 
 primary
 
 motivation for the transfer was a security concern * * * rather than a medical concern” (242 AD2d, at 419,
 
 supra
 
 [emphasis supplied]). Here, the court erred as a matter of law. Contrary to the view of the Appellate Division, in the case of a violent mentally ill patient, security concerns are inextricably linked to considerations of professional medical treatment, as expressly pointed out in the regulatory findings. As already noted, 14 NYCRR 57.1 itself states that patients such as Aliza K. are medically benefitted by a transfer to Kirby because Kirby’s specially trained staff and perimeter security permit freer movement and the possibility of therapies which would not be available at a hospital like MFC. Thus, it is not the province of the courts to weigh the degrees of medical and security considerations which may go into any individual transfer decision. Consequently, the decision to transfer Aliza K. is properly viewed as a medical decision, just as was the transfer at issue in
 
 Savastano.
 

 
 *510
 
 Finally, as to the third prong of the
 
 Mathews v Eldridge
 
 inquiry, the government in this case has a strong interest in avoiding “the significant administrative and fiscal burdens which would result from the necessity of holding a prior judicial hearing each time an involuntary patient objects to being transferred” to a secure facility
 
 (Savastano v Nurnberg, supra,
 
 at 309). As we noted in
 
 Savastano,
 
 and the United States Supreme Court pointed out in
 
 Parham,
 
 requiring mental hospital professional staff to defend their clinical decisions in time-consuming judicial hearings diverts already scarce resources from the care and treatment of the mentally ill
 
 (Savastano v Nurnberg,
 
 at 310;
 
 Parham v J. R., supra,
 
 442 US, at 605-606). Thus, the procedures required by 14 NYCRR part 57 satisfy the requirements of procedural due process in all respects (see
 
 also, Vitek v Jones, supra,
 
 445 US, at 494-495).
 

 We also find meritless the argument that the petitioner was denied equal protection because persons found not responsible for criminal conduct by reason of mental disease or defect are entitled to a judicial hearing under CPL 330.20 for purposes of determinations of whether they suffer from a dangerous mental disorder or are otherwise mentally ill. Since 14 NYCRR part 57 and CPL 330.20 address different classes of persons posing different legal concerns, a rational basis exists for having different procedures to determine the appropriateness of transfer decisions. Thus, in this respect we agree with the Appellate Division that Supreme Court erred in finding a deprivation of equal protection here.
 

 Accordingly, the order of the Appellate Division should be reversed, without costs, the petition for a writ of habeas corpus should be denied, and judgment should be granted declaring that 14 NYCRR 57.2 is not rendered unconstitutional by virtue of its failure to provide for a hearing prior to transfer of a patient from a nonsecure to a secure OMH facility.
 

 Chief Judge Kaye and Judges Bellacosa, Smith, Ciparick and Wesley concur.
 

 Order reversed, etc.