[812 NYS2d 496]

STATE OF NEW YORK ex rel. STEPHEN J. HARKAVY, on Behalf of JOHN DOE NOS. 1 THROUGH 12, Respondent-Appellant, v EILEEN CONSILVIO, as Executive Director of Manhattan Psychiatric Center and Kirby Forensic Psychiatric Center, Appellant-Respondent.

First Department, March 30, 2006

### APPEARANCES OF COUNSEL

*Eliot Spitzer, Attorney General,* New York City (*Julie Lough-ran, Caitlin J. Halligan* and *Daniel Smirlock* of counsel), for appellant-respondent.

*Marvin Bernstein, Mental Hygiene Legal Service,* New York City (*Sadie Zea Ishee, Stephen J. Harkavy* and *Karen Gomes Andreasian* of counsel), for respondents-appellants.

### OPINION OF THE COURT

MALONE, J.

We are asked on this appeal to determine whether petitioners, all of whom at least three doctors have found so dangerously mentally ill as to require their involuntary civil commitment to inpatient psychiatric facilities, are subject to procedures under Mental Hygiene Law article 9, which applies to the general public, or Correction Law § 402, which applies to mentally ill prisoners. On the facts presented, we find no basis to provide petitioners heightened due process protections not afforded to their nonincarcerated counterparts and thus would hold that respondent Eileen Consilvio properly proceeded pursuant to the Mental Hygiene Law in committing petitioners for involuntary psychiatric hospitalization.

Much publicized in the news, this is an appeal and cross appeal from the partial grant of a habeas corpus petition, denominated one under CPLR article 70, for the release of 12 individuals currently committed to Office of Mental Health (OMH) psychiatric facilities. Each of the 12 petitioners was, im-

mediately prior to his commitment, in the custody of the Department of Correctional Services (DOCS). Each was a felony sex offender about to be released from prison when two OMH physicians certified his need for commitment pursuant to Mental Hygiene Law § 9.27 based upon their examinations and their findings that in each case, petitioner suffered from a mental illness and without inpatient psychiatric treatment would likely seek additional sexual victims upon his release from prison into the broader community. And in each case, before the individual's release, the prison superintendent completed an application for involuntary commitment on medical certification. Then, upon the expiration of his sentence, each petitioner was transported to the OMH facility where he was examined by a third OMH physician, who found him in need of commitment.

None of the petitioners challenged his retention. Rather, over a month after the first petitioner was committed, Mental Hygiene Legal Service brought this proceeding on all of petitioners' behalf, arguing that petitioners' retention was unlawful because it should have been made, if at all, pursuant to the procedures of the Correction Law which, in contrast to Mental Hygiene Law § 9.27, provides for a precommitment hearing. Petitioners also argued that Mental Hygiene Law article 9 procedures as applied to them were unconstitutional. Respondent argued that Mental Hygiene Law article 9 was properly applied to petitioners because at the time they were committed, they were no longer serving sentences of imprisonment.

The IAS court granted the petition, finding that since the petitioners were never out of custody at the time of their commitment, they could only have been committed pursuant to the procedures of Correction Law § 402. It then directed respondent to allow for the examination of each petitioner by two independent examining physicians to be appointed by the court and ordered the immediate release of any petitioner who was not certified by both physicians as mentally ill, in need of care and treatment at a psychiatric hospital, and posing a substantial threat of physical harm to themselves or others.

Statutory Framework

"Unless otherwise specifically provided for by statute," Mental Hygiene Law article 9 governs all admissions of mentally ill patients to inpatient psychiatric facilities which the director oversees (Mental Hygiene Law § 9.03). The Mental Hygiene Law in general, and section 9.27 in particular, places primary

authority over admissions in the hands of doctors and ensures that commitment occurs only after several preconditions have been met. First, at least two physicians must certify that an individual is "mentally ill"[1] according to the statutory scheme, that involuntary care and treatment is necessary or essential to his welfare and that his "judgment is so impaired that he is unable to understand the need for such care and treatment" (Mental Hygiene Law § 9.01; § 9.05 [b]; § 9.27 [a]; *see Matter of Gilliard v Sanchez*, 219 AD2d 500 [1995]). Second, the two physician certifications must be accompanied by an application for admission executed within 10 days prior to admission by one of several statutorily designated persons (Mental Hygiene Law § 9.27 [b]). Third, the prospective patient must be brought to the inpatient psychiatric facility and examined there forthwith by a third physician who must concur with the conclusion of the two original certifying physicians (Mental Hygiene Law § 9.27 [e]).

A patient may demand a hearing before Supreme Court within 60 days of his involuntary admission (Mental Hygiene Law § 9.31); if no such demand is made, he can be held for only 60 days, unless an application is made authorizing continued retention for up to six months (Mental Hygiene Law § 9.33 [a], [b]). Upon receipt of such application, the patient may demand, or the court on its own motion may calendar, a hearing on the need for involuntary retention (Mental Hygiene Law § 9.33 [c]). Finally, within 30 days after an adverse decision following a Mental Hygiene Law § 9.31 or § 9.33 hearing, a patient may demand a rehearing and review of the prior proceeding before a jury (Mental Hygiene Law § 9.35).

Similarly, the procedures set forth in the Correction Law ensure that only inmates who are both mentally ill and in need of inpatient care and treatment are committed involuntarily (Correction Law § 400 [4]). If a mentally ill person undergoing a sentence of imprisonment cannot be safely held in the prison, application is made by the prison superintendent to the court to cause an examination to be made of such person by two examining physicians (Correction Law § 402 [1]). In New York City, the petition seeking commitment must include two physician certif-

---

1. Under the Mental Hygiene Law, a "mental illness" is "an affliction with a mental disease or mental condition which is manifested by a disorder or disturbance in behavior, feeling, thinking, or judgment to such an extent that the person afflicted requires care, treatment and rehabilitation" (Mental Hygiene Law § 1.03 [20]).

icates stating that the prisoner is mentally ill and in need of care and treatment, and must be served personally upon the alleged mentally ill prisoner (Correction Law § 402 [2]-[3]). The court may, upon request or its own motion, hold a hearing and, if deemed advisable, examine the alleged mentally ill person either in or out of court (Correction Law § 402 [4]-[5]).

The inmate upon his commitment becomes an "inmate-patient" (Mental Hygiene Law § 29.27 [a]) and is in the custody of OMH for the period stated in the order of commitment. If hospitalization is no longer necessary, custody of the inmate reverts back to DOCS and OMH's responsibility for him terminates (Mental Hygiene Law § 29.27 [e], [f]). If, on the other hand, continued hospitalization beyond the authorized period or expiration of sentence is necessary, retention must be made in accordance with Mental Hygiene Law article 9 (Mental Hygiene Law § 29.27 [c]; Correction Law § 404 [1]).

Discussion

It is a cardinal rule of statutory construction that all parts of an act should be harmonized, to be read and construed together in a manner most consistent with the overall legislative intent (*Matter of Pilgrim Psychiatric Ctr. [Christian F.]*, 197 AD2d 204, 207 [1994]; McKinney's Cons Laws of NY, Book 1, Statutes §§ 97, 98). Completely overhauled by the Legislature in 1976, Correction Law article 16 along with the inmate-patient provision of Mental Hygiene Law § 29.27, was enacted to ensure that, in concert with DOCS, OMH provide mentally ill inmates appropriate psychiatric care in both prison and psychiatric hospitals when necessary, and upgrade the quality of care while at the same time providing adequate assurances of security for the duration of the inmate's sentence (Governor's Mem approving L 1976, ch 766, § 1, reprinted in 1976 McKinney's Session Laws of NY, at 2445; Mem of State Exec Dept, reprinted in 1976 McKinney's Session Laws of NY, at 2397-2398). Because the Correction Law applies only to persons undergoing a sentence of imprisonment, it contemplates return to a DOCS facility. Indeed, Correction Law § 404 (1) states that the Mental Hygiene Law commitment procedures control where a hospitalized inmate no longer serving a sentence becomes a free individual.

Based upon the facts presented here, we believe that the Supreme Court's holding that Correction Law § 402 governs petitioners' commitments is inconsistent with its plain meaning and legislative intent. The Correction Law clearly does not ap-

ply to the two petitioners whose applications were submitted on the date of their release. As to the remaining 10 petitioners, whose applications were submitted from one to four days prior to their conditional release, release to parole supervision or expiration of their terms, there was no possibility that they would be returned back to DOCS' custody as the Correction Law contemplates. Moreover, a few hours or days remaining in the sentence of these individuals as of the time of the application did not, as Supreme Court postulated, render them "person[s] undergoing a sentence of imprisonment." (10 Misc 3d 851, 855 [2005].) Such a reading finding the Correction Law applicable to these petitioners is hypertechnical and without support in the legislative intent.

Conversely, by its plain text, the Mental Hygiene Law applies to petitioners (Mental Hygiene Law § 9.03). Under the Mental Hygiene Law scheme, a petitioner's status is fixed not on the date of the application seeking commitment but rather on the date of "commitment," i.e., the date of the certification of the third physician confirming the necessity of commitment. Here, each petitioner was committed on the date of his release from prison. Thus, at the time of commitment, each petitioner was a free citizen no longer "undergoing a sentence of imprisonment." As such, under both the Mental Hygiene Law and the Correction Law, respondent properly sought retention in accordance with Mental Hygiene Law article 9 (Mental Hygiene Law § 29.27 [c]; Correction Law § 404 [1]).

We nonetheless agree with Supreme Court that DOCS had standing to make the applications pursuant to Mental Hygiene Law.[2] Pursuant to Mental Hygiene Law § 9.27 (b) (4), "an officer of any public or well recognized charitable institution or agency or home in whose institution the person alleged to be mentally ill resides" may execute an application for involuntary commitment. By reading this section so that "public" and "well recognized" apply to "charitable," and "charitable" modifies "institution," "agency" and "home," petitioners read the section as applying to: an officer of a public charitable institution, charitable agency or charitable home, or a well-recognized

---

2. In a related matter entitled *State of N.Y. ex rel. Harkavy v Consilvio* (11 Misc 3d 1053[A], 2006 NY Slip Op 50191[U], *5), Justice Silbermann reversed herself, stating that she misread Mental Hygiene Law § 9.27 (b). She ruled that "[c]learly, a prison superintendent is not an officer of a charitable institution or agency, and, as such, is not an appropriate applicant for the involuntary admission of a person pursuant to § 9.27 of the Mental Hygiene Law." (*Id.*)

charitable institution, charitable agency or charitable home. Conversely, respondent's reading of the provision is that it applies to: a public institution, public agency or public home, or a well-recognized charitable institution, charitable agency or charitable home. Respondent's interpretation of the statute is correct.

As a matter of grammar, the repeated use of the disjunctive "or" in the sentence indicates that both "public" and "well recognized charitable" entities are authorized to make the application. As a matter of word choice, the term "agency" commonly refers to governmental entities, which suggests that the term "public" modifies institution, agency and home. Moreover, the second use of the term "institution" suggests that the section is to apply not just to charitable institutions. Finally, as supported by the legislative history, the 1972 amendment adding the word "public" to the statute, where there had before been only "charitable," further suggests that "public" was to have independent meaning. Thus, as a public agency in whose institution the individual resided at the time of the application, DOCS had standing to make the application.

Petitioners' alternative argument, that the procedures under Mental Hygiene Law article 9 deprived them of their due process rights under the Fourteenth Amendment, is also baseless (*Project Release v Prevost*, 722 F2d 960 [1983]; *Matter of K.L.*, 1 NY3d 362, 371 [2004]). Distinguishable on its facts is *Vitek v Jones* (445 US 480 [1980]), where the United States Supreme Court struck down a Nebraska statute which allowed transfers of prisoners to a psychiatric hospital without a predeprivation judicial hearing. Since petitioners were no longer prisoners at the time of their commitment, any *Vitek* concerns are not present.

Vehicle for Relief

Petitioners commenced the instant habeas corpus proceeding pursuant to CPLR article 70. This was error. By its express terms, CPLR article 70 applies to all cases in which habeas relief is sought "[e]xcept as otherwise prescribed by statute" (CPLR 7001; *see also* CPLR 101). Under the Mental Hygiene Law, habeas relief is specifically available to both inmate-patients committed to civil psychiatric facilities pursuant to Correction Law § 402 (Mental Hygiene Law § 29.27 [c]) and those retained in psychiatric facilities (Mental Hygiene Law § 33.15). Accordingly, Mental Hygiene Law

§ 33.15, which is directed exclusively to those retained in psychiatric facilities, is the more specific habeas provision and thus controlling in these mental hygiene cases (*Matter of Lupoli*, 275 AD2d 44, 50 [2000]; *cf. People ex rel. Ledwith v Board of Trustees of Bellevue & Allied Hosps.*, 238 NY 403, 408 [1924]).

While the Supreme Court correctly concluded that the petition should have been brought pursuant to Mental Hygiene Law § 33.15, by ordering the conditional release of petitioners upon one examining physician's certification that they are not "mentally ill, in need of care and treatment at a psychiatric hospital, and posing a substantial threat of physical harm to themselves or others" (10 Misc 3d at 858), it did not follow the provisions of that section. Mental Hygiene Law § 33.15 (b) states:

> "Upon the return of such a writ of habeas corpus, the court shall examine the facts concerning the person's alleged mental disability and detention. The evidence shall include the clinical record of the patient and medical or other testimony as required by the court. The court may review the admission and retention of the person pursuant to the provisions of this chapter. The court shall discharge the person so retained *if it finds that he is not mentally disabled or that he is not in need of further retention for in-patient care and treatment*" (emphasis added).

Given this language, Mental Hygiene Law § 33.15 requires a judicial determination of sanity in each case (*see also Matter of Stone*, 294 AD2d 59 [2002]; *People ex rel. Thorpe v Von Holden*, 63 NY2d 546 [1984]). The court's order conditionally releasing petitioners without conducting its own review as to the state of each individual's mental disability was improper.

Accordingly, the order and judgment (one paper) of the Supreme Court, New York County (Jacqueline W. Silbermann, J.), entered on or about November 15, 2005, which granted the habeas corpus petition insofar as to order the conditional release of petitioners, should be reversed, on the law, without costs, the order for the conditional release vacated and the petition dismissed.

Motion seeking leave to enlarge record and file an extended surreply denied.

TOM, J.P., FRIEDMAN, SULLIVAN and CATTERSON, JJ., concur.

Order and judgment (one paper), Supreme Court, New York County, entered on or about November 15, 2005, reversed, on the law, without costs, the order for the conditional release of petitioners vacated and the petition dismissed. Motion seeking leave to enlarge record and file an extended surreply denied.